UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
THE CITY OF NEW YORK,         :
         :
      Plaintiff,      :         **OPINION AND ORDER**
         :         03-CV-3560 (DLI) (VVP)
    -against-      :
         :
GEODATA PLUS, LLC,         :
         :
      Defendant.     :
--------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff, the City of New York (the "City" or "Plaintiff"), brings this copyright infringement action against defendant GeoData Plus, LLC ("GeoData" or "Defendant"), alleging that GeoData copied portions of a copyrighted database created by the Department of City Planning (the "DCP") of the City of New York. Specifically, Plaintiff alleges that Defendant copied the 1998 version of the City's Bytes of the Big Apple™ Tax Block and Tax Lot Base Maps Files in DXF™ Format[1] (the "Bytes Files") and incorporated the Bytes Files into a commercial product that GeoData sells and distributes to its customers. Plaintiff now moves for partial summary judgment finding GeoData liable for copyright infringement. Defendant simultaneously moves to dismiss Plaintiff's claims for statutory damages and attorneys' fees.

As set forth below, the court finds that GeoData infringed on the City's copyright and, therefore, grants the City's motion for partial summary judgment. Furthermore, the court denies GeoData's motion to dismiss Plaintiff's claims for statutory damages and attorneys' fees.

---

[1]"TM" designations will be affixed to a word or phrase as appropriate the first time it is used in the opinion, but will be omitted whenever the word or phrase is used thereafter.

1

## I.     Background

### A.     Parties

The DCP is a department of the City responsible for the City's physical and socioeconomic planning, including land use and environmental review, preparation of plans and policies, and provision of technical assistance and planning information to government agencies, public officials and community boards.  (Compl. ¶ 7.)  The DCP is also responsible for land use analysis in support of the City Planning Commissions's review of proposals for zoning map and text amendments, special permits under the Zoning Resolution, changes in the City's maps, acquisition and disposition of City-owned property, acquisition of office space for City use, site selection for public facilities, urban renewal plans and amendments, landmark and historic district designations, and community-initiated plans under Section 197-a of the City Charter.  (Compl. ¶ 8.)

Defendant, Geodata, is a New York limited liability company that gathers and disseminates real property sales and other data, including digital maps, deeds, and tax assessment records. (Vinsky Decl. at ¶ 6.)  This data is primarily used by real estate professionals, including real estate brokers, banks, attorneys, and mortgage brokers, for appraisals and comparable sales analysis of similar properties in various geographical areas.  (Vinsky Decl. ¶¶ 6-14.)  George Vinsky is the president of GeoData.  (Vinsky Decl. ¶ 1.)

### B.     The Bytes Files

The City is the creator and owner of the Bytes Files, which are one of three sets of digital geographic base map files included in the City's Bytes of the Big Apple project.[2]  (Pl.'s 56.1[3] ¶ 7.)

---

[2]The three geographic base map files that make up the Bytes of the Big Apple project are (1) a single line street base map file, called the DCPLION; (2) a set of district boundary polygon files for various types of administrative and political districts (the "District Files"); and (3) tax block and

The Bytes Files contain mapping coordinates and other data that permit licensed users to view vectorized images[4] of the tax blocks and tax lots in New York City's boroughs, and work with the images in commercially available GIS software programs. (Pl.'s 56.1 ¶ 6.) Prospective users of the Bytes Files must purchase a license from the DCP for $250 per borough. (Miller Decl. ¶ 9.) In exchange, licensees receive tax lot outlines, tax block outlines, street names, and tax block and tax lot center points on five CD-ROMs, one for each of the City's boroughs, as well as the City's permission to use the Bytes Files.[5] (Miller Decl. ¶ 9.)

The City owns the copyrights associated with two versions of the Bytes Files. (Pl.'s 56.1 ¶¶ 8-10.) The City filed its copyright registration with the United States Copyright Office (the "USCO") for the original version of the Bytes Files on January 27, 1995, and received registration number TX 4-018-885 with an effective date of March 21, 1995. (Miller Decl. Ex. B.) The DCP updated the Bytes Files in 1998 and submitted the updated version for copyright registration on

---

tax lot base map files (the Bytes Files). (Pl.'s 56.1 ¶ 7.) The DCP offers the DCPLION files and the District Files free to the public from its website. (Miller Decl. ¶ 8.) These geographic base map files can be imported into a wide variety of geographic information systems ("GIS") software products used to produce computer-generated maps and to perform spatial analysis. (Pl.'s 56.1 ¶ 7.)

[3]"Pl.'s 56.1" refers to Plaintiff's 56.1 Statement submitted with Plaintiff's summary judgment motion.

[4]Vectorized images are created using x, y coordinates that can be registered to a standard geographic mapping system, such as latitude and longitude. (Miller Decl. ¶ 14 n.1.) Vectorized images are to be distinguished from raster images, which are two-dimensional images similar to digital photographs. (Miller Decl. ¶ 14 n.1.) Images on a piece of paper can be scanned into a computer in order to produce raster images. (*See* Miller Decl. ¶ 14 n.1.) Vectorized images are more manipulable than raster images; for example, they are searchable. (Miller Decl. ¶ 14 n.1.)

[5]Licensees receive the tax block base map files for free, and the tax block outlines can also be obtained for free from the DCP's website. (Miller Decl. ¶ 9.) The tax lot outlines are not free to the public, though the City does not restrict distribution of raster versions of the tax lot and tax block files. (*See* Miller Decl. ¶9; Kelly Dep. 21:3-20 (in Buchsbaum Decl. Ex. 3, Oct. 11, 2005).)

October 4, 2002.  (Pl.'s 56.1 ¶ 10; Buchsbaum Decl. Ex. 3, Aug. 19, 2005.)  The updated 1998 version reflected changes made due to splits and mergers of lots since the first version was created, as well as errors contained in the earlier version.  (Pl.'s 56.1 ¶ 10.)  The USCO assigned to the updated version certificate registration number TX 5-589-344, which became effective on October 4, 2002.  (Pl.'s 56.1 ¶ 10; Buchsbaum Decl. Ex. 3, Aug. 19, 2005.)

The Bytes of the Big Apple project grew out of a predecessor database project called Community Oriented Geopositional Illustration Structure ("COGIS"), started in the early 1980s and completed around 1993.  (Pl.'s 56.1 ¶¶ 11-12.)  COGIS is a digital geographic representation of the City's tax blocks and tax lots in a vectorized format using GIS coordinates.  (Pl.'s 56.1 ¶ 12.)  The database contains street names and a variety of other information the DCP uses for planning purposes and internal work.  (Pl.'s 56.1 ¶ 12.)  The DCP developed COGIS to eliminate the need for tedious hand-drawn mapping.  (Pl.'s 56.1 ¶¶ 11-12.)

To create COGIS, DCP programmers started with the official tax maps from the City's Department of Finance (the "DOF")[6] and the Borough Presidents' offices, both of which maps are available to the public.  (Pl.'s 56.1 ¶¶ 13-14.)  First, the programmers used the Borough Presidents' maps to digitize the City's blocks.  (Pl.'s 56.1 ¶ 14.)  Next, the DOF maps were registered to the block outlines from the Borough Presidents' maps.  (Pl.'s 56.1 ¶ 14.)  Finally, the DCP's digitizing staff then digitally "traced" the outlines of each of the tax lots from the tax maps.  (Pl.'s 56.1 ¶ 14.)

---

[6]The DOF maps are maintained on over 16,000 large 22-by-14 inch sheets of mylar, a strong polyester film that enables map drawers to easily erase and re-draw lot lines as necessary, that cover every tax block and lot in New York City.  (Pl.'s 56.1 ¶ 13.)  The DOF continually updates these maps manually to reflect mergers and splits in lots and other changes.  (Pl.'s 56.1 ¶ 13.)  The mylar sheets are photocopied and reduced in size to render paper copies that are available to the public. (Pl.'s 56.1 ¶ 13.)

This digital "tracing" was a painstaking process accomplished by manually selecting coordinates on a plane to create various lengths of successive straight line segments in order to approximate the original images. (Pl.'s 56.1 ¶¶ 14, 23; Miller Decl. Ex. D at 2.) During this "tracing" process, the digitizing staff made decisions at every step concerning the number and location of coordinates used to depict various shapes in the maps, such as the curved lines in tax lots. (Pl.'s 56.1 ¶¶ 14, 23.) In addition, while the COGIS database incorporated the tax lot outlines and tax block and lot numbers from the DOF maps, not all of the features of the DOF maps were captured. (Pl.'s 56.1 ¶ 14.) For example, COGIS added to its database street center malls bearing "fake" lot numbers in the middle of Park Avenue in Manhattan and Pelham Parkway in the Bronx. (Miller Decl. Ex. D at 2.)

Upon completion, COGIS was only for internal use and was not available to the public. (Pl.'s 56.1 ¶ 15.) However, the DCP realized that it had an extremely useful tool on its hands and decided to market and sell the digital tax block and lot outlines to the public as licensed products, which would be available on diskettes under the Bytes of the Big Apple project as the Bytes Files. (Pl.'s 56.1 ¶ 16.)[7] The Bytes Files became available on October 31, 1994. (*See* Miller Decl. Ex. B.)

The end user Bytes Files product is a geographic database that (1) contains a digital graphic representation of each tax lot in New York City, (2) relates the several hundred thousand tax lot features geographically to one another and to a global coordinate system in a way that was not possible with the 16,000+ mylar and paper DOF maps, and (3) adds database functionality to each tax lot feature, all of which permits a licensee to generate reports and perform queries on the tax lot data. (Miller Decl. ¶¶ 22-23.)

---

[7]In order to package COGIS for the public, however, the DCP had to convert the database into a more readily accessible format, and the Bytes Files were thus released, first, in Adobe Illustrator™ Format, and, later, in DXF Format. (Pl.'s 56.1 ¶ 17.)

## C.    GeoData's Map

GeoData states that it began development of its product in about October 1999, seeking to offer an advanced multi-layered digital presentation of data and maps related to New York. (Def.'s 56.1[8] ¶ 48.) As a part of its product, GeoData sought to provide vectorized tax lot and block maps for various New York Counties. (Def.'s 56.1 ¶ 49.)

GeoData alleges that it hired DeltaSoft Creative Group ("DeltaSoft"), a Kyrgyzstanian company, to create vectorized tax maps of New York City and Nassau County. (Def.'s 56.1 ¶ 50.) All of GeoData's communications with DeltaSoft were allegedly conducted using an Internet chat program called "ICQ," with the exception of one communication via telephone. (Vinsky Decl. ¶ 19.)

To assist DeltaSoft in its work, GeoData asserts that it provided DeltaSoft with Internet access to a raster version of the DOF tax maps. (Def.'s 56.1 ¶ 51; *see also* Komarov Decl. ¶ 4.[9]) DeltaSoft also allegedly had access to publicly available tax block maps and raster versions of tax lot maps. (Komarov Decl. ¶ 4.) Andrew Komarov, a former manager of DeltaSoft, claims that DeltaSoft used various software programs, including "R2V," to create GeoData's vectorized tax maps. (Komarov Decl. ¶¶ 1, 4.) R2V is a software program that automatically converts raster

---

[8]"Def.'s 56.1" refers to Defendant's 56.1 Statement submitted in response to Plaintiff's 56.1 Statement for its summary judgment motion.

[9]The City challenges the admissibility of Komarov's declaration. The City asserts that Komarov does not speak or understand English, and his declaration should thus be in his native language, Russian, and accompanied by a certified translation. If it is, in fact, true that Komarov does not speak or understand English, the City is correct that Komarov's declaration, as currently presented to the court, is inadmissible. *See Ediciones Quiroga, S.L. v. Fall River Music, Inc.*, 93 Civ. 3914(RPP), 1998 WL 851574, at *2 n.3 (S.D.N.Y. Dec. 7, 1998) ("Translations of foreign-language documents which are not certified as true and accurate translations and which do not even identify the translator are not properly authenticated and are not admissible as evidence.") However, for the purposes of this summary judgment motion, the court will assume, *arguendo*, that Komarov's declaration is admissible.

images into vector representations.  (Golland Decl. Ex. 2 at 4, Oct. 10, 2005.)  GeoData states that DeltaSoft delivered the completed maps to GeoData in sections over a period of several months via a broadband Internet connection that GeoData provided.  (Def.'s 56.1 ¶¶ 53-54.)  In exchange for DeltaSoft's services, GeoData alleges that it paid DeltaSoft approximately $15,000.  (Def.'s 56.1 ¶ 54.)

After DeltaSoft transmitted the completed tax maps to GeoData, GeoData asserts that it reviewed and corrected the maps and, subsequently, integrated them into the GeoData software package.  (Def.'s 56.1 ¶ 54.)  GeoData then added additional features to its map, including shorelines, county lines, parks, and other features based on public sources of information.  (Vinsky Decl. ¶ 32.)  It appears that GeoData began selling its product on August 10, 2001.  (Def.'s Motion to Dismiss ("MTD") Mem. 3.)

Vinsky states in his declaration that GeoData never heard of the Bytes of the Big Apple project until it received a cease-and-desist letter from the City dated November 20, 2002.  (Vinsky Decl. ¶ 32.[10])  He further claims that he did not have access to the Bytes of the Big Apple files prior to this litigation.  (Vinsky Decl. ¶ 32.)

## II.    Plaintiff's Motion for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

---

[10]The paragraphs in Vinsky's declaration are misnumbered.  Here, the reference to paragraph 32 is to the first paragraph numbered 32 on page seven of Vinsky's declaration.

of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. - - -, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 1776.

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir. 1994) (citation omitted).

### B.     Copyright Infringement

In order to establish a claim for copyright infringement, "a plaintiff must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997).

### 1.     Copyright Validity

When a work is copyrighted with the USCO, such copyright registration is "prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c) (2007); *Fonar Corp.*, 105 F.3d at 104

(citations omitted). Furthermore, "possession of a registration certificate creates a rebuttable presumption that the work in question is copyrightable." *Fonar Corp.*, 105 F.3d at 104 (citation omitted). There is no dispute that the City owns the copyright in the Bytes Files. However, GeoData argues that the Bytes Files are not copyrightable.

### a.      Originality Requirement

"To qualify for copyright protection, a work must be original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). In *Feist*, the Supreme Court provided extensive guidance concerning the definition of "original" in this context:

> Original, as the term is used in copyright, means only [1] that the work was independently created by the author (as opposed to copied from other works), and [2] that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

*Id.* (internal citations omitted). Accordingly, physical and historical facts are not original because they "do not owe their origin to an act of authorship," and thus cannot be copyrighted. *Id.* at 347.

Maps, to a certain degree, can be copyrighted. While the factual information conveyed in a map, such as landmarks and street locations, is not entitled to copyright protection, "any originality in the manner of expression employed in communicating the factual information" can be protected by a copyright. *Sparaco v. Lawler, Matusky, Skelly, Eng'rs LLP*, 303 F.3d 460, 467 (2d Cir. 2002). The Second Circuit explained that, "[w]ithout doubt, considerable skill and originality can be exercised by a mapmaker in the setting forth of unprotected information–in the selection or elimination of detail, the size, shape, and density of informative legends, the establishment of conventions relating to color or design to represent topographical or other features, and many other

details of presentation." *Id.*; *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 748 (2d Cir. 1998) (acknowledging as copyrightable "the overall manner in which [the plaintiff] selected, coordinated, and arranged the expressive elements in its map, including color, to depict the map's factual content").

GeoData claims that the City's copyrights in the Bytes Files are invalid because the Bytes Files lack sufficient originality. GeoData argues that the Bytes of the Big Apple tax maps are essentially a vectorized representation of paper tax block and lot maps maintained by the City pursuant to statute. The maps, GeoData contends, simply depict–without any originality or creativity–existing physical characteristics of the City, which are facts not entitled to copyright protection. The City, on the other hand, argues that the creation of the Bytes Files involved the exercise of discretion and extensive non-mechanical decision-making in the selection and presentation of the data, which was, in their view, at least sufficient to meet the low standard for originality articulated in *Feist*.

The court finds that, although none of the factual representations in the Bytes Files, such as the tax block and lot boundaries themselves, are protectible, there is sufficient originality in the Bytes Files as a whole to justify copyright protection under the *Feist* standard. In creating COGIS, the predecessor to the Bytes Files, DCP programmers took paper maps from the DOF and the Borough Presidents' offices, scanned them into a computer, and manually "traced" the outlines of the tax lots from the DOF maps. In doing so, the programmers made numerous independent decisions concerning the number and location of coordinates used to depict various shapes in the maps, such as the curved lines in tax lots. Furthermore, they made decisions concerning which features to incorporate and which to exclude. For example, the DCP added to its database street center malls

10

in the middle of Park Avenue in Manhattan and Pelham Parkway in the Bronx. The resulting COGIS database–and, by extension, the Bytes Files, which incorporated the COGIS tax block and lot outlines–is not identical to the underlying DOF or Borough Presidents' maps.

GeoData's argument that the tax blocks and lots are mandated by statute and, therefore, lack originality is unavailing. The statutory provisions GeoData cites, NYC Admin. Code §§ 2-202, 11-202, 11-203, concern the delineation of the boundaries of the City's boroughs and the mandate that the DOF create and maintain official tax maps, which the DOF is in compliance with. GeoData does not point to any statutory provision requiring, in addition, that the City maintain a digitized or vectorized version of the maps. The fact that the DOF tax maps are mandated by statute does not, therefore, somehow abrogate the validity of the Bytes Files' copyright. As explained above, for our purposes here, the Bytes Files are not identical to, and thus materially differ from, the DOF maps.[11]

The court further rejects GeoData's contention that the representations in the Bytes Files were based on principles of all-inclusiveness, requiring no creativity. GeoData emphasizes, for example, that the decision to add Park Avenue malls to the COGIS maps / Bytes Files was not an act of creativity but instead was dictated by DCP's mandate–*i.e.*, the malls were added "because of their significance from a streetscape and planning perspective." (Def.'s Opp. Mem. to Pl.'s Summary Judgment Motion 16-17 (quoting Miller Decl. Ex. D at 2).) However, the fact that a sound rationale

_____

[11]Consequently, GeoData's other "derivative" argument similarly is rejected. GeoData argues that "[s]imilar to the DOF official tax maps here, judicial opinions, being uncopyrightable, are in the public domain," citing *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 674, 682-83 (2d Cir. 1998). First, the Second Circuit has made clear that, unlike judicial opinions, tax maps are not necessarily in the public domain since inception. *See County of Suffolk, N.Y. v. First Am. Real Estate Solutions*, 261 F.3d 179, 193-194 (2d Cir. 2001). In any event, even if the DOF maps are in the public domain–an issue this court declines to address–it does not follow that the Bytes Files, which are different from the DOF maps, are derivatively in the public domain.

was used in making decisions as to design does not deprive them of their originality or creativity. To hold otherwise would unduly hamstring mapmakers whose choices concerning what to feature in their maps must necessarily be based on a desire to present a coherent depiction of a particular area, according to their individual perspectives of what that might be. Far from demonstrating a lack of creativity, it is precisely these choices that confer copyright protectibility on the resultant maps.

The court equally finds without merit GeoData's argument that the City used standard cartographic methods–drawing two points for each line segment to represent straight lines–to create the challenged maps, thus reflecting a complete lack of creativity and novelty. The *Feist* court stated in no uncertain terms that "novelty is not required" to establish originality. 499 U.S. at 346. In addition, the fact that the creation process was mechanized does not strip it of originality. While mapmaking in general has certainly been transformed by the use of computers, there are still myriad ways to create a map using computerized equipment, just as there are when drawing a map by hand. Although there may be a standard method to draw lines and curves–*i.e.*, mapping two coordinates on a plane and drawing a line between them to create a straight line, and placing several short lines together in close successive proximity to create curved lines–a digital mapmaker may decide to create rough, boxy shapes with only a few coordinates and lines, or the mapmaker could use thousands of coordinates and lines to make the curves as smooth as possible.

The Bytes Files were, in part, digitally "traced" from the DOF tax maps. However, the "tracing" technique did not involve merely taking a pencil and copying lines through a translucent sheet. Nor did it involve a simple, mechanical process that automatically caused digitized or vectorized images to appear on a computer screen. Instead, the "tracing" involved the manual selection of coordinates to create various lengths of straight lines in order to approximate the original

12

images.  This process–unlike rote copying–involved a distinctly human element in which many independent decisions had to be made concerning how best to reflect selected shapes given the limited nature of the digitized "drawing" tool.  This is very different from the scanning in of images and using a software program to approximate the images at the command of one keystroke, which strips the independent decision-making element entirely from the process.[12]

Taking into consideration the process by which the Bytes Files were created, as well as the other independent decisions involved in their creation–*i.e.*, which sources to use, which features to include or exclude–there is ample uncontested evidence of originality to surpass the minimum *Feist* standard.  Accordingly, the copyrights for the Bytes Files are valid.

### b.    Merger Doctrine

GeoData argues that, in any event, under the so-called "merger doctrine," the Bytes Files are not capable of being copyrighted.  In some circumstances, even if the originality requirement is satisfied, a work is not entitled to copyright protection "where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991).  As already articulated above, there were many ways that the City could have "drawn" its vectorized map.  *See Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 138 (5th Cir. 1992) (recognizing that maps may be "capable of a variety of expressions").  The City is not attempting to copyright the *idea* of vectorizing maps, but merely to protect its version of the map.  Therefore, the merger doctrine has no application here.

---

[12]The emphasis here is on the fact of independent decision-making as opposed to effort.  It is important to emphasize that the City's effort in creating the Bytes Files, while prodigious, is not a material factor in this context.  "Sweat of the brow" is no longer an adequate basis for a finding of originality sufficient to justify copyright protection in a particular work.  *See Sparaco*, 303 F.3d at 466.

## 2. Copying

To demonstrate copying, the plaintiff has the burden of showing that "(1) the defendant actually copied the plaintiff's work; and (2) the copying is illegal because a 'substantial similarity' exists between the defendant's work and the protectible elements of the plaintiff's work." *Streetwise Maps, Inc.*, 159 F.3d at 747 (citation omitted).

### a. Actual Copying or Access

In order to satisfy the first element, actual copying, the plaintiff may either introduce direct evidence of copying or "show[] that the defendant had access to the plaintiff's work and that the works are similar enough to support an inference that the defendant copied the plaintiff's work." *Streetwise Maps, Inc.*, 159 F.3d at 747 (citations and internal quotation marks omitted). However, "[i]f. . . two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 471 (2d Cir. 1995)).

The City states that, during discovery, GeoData provided the City with a copy of compact discs distributed by a competitor company named COMPS, Inc. that had a license for the Bytes Files. (Pl.'s 56.1 ¶ 30.) According to the City, this proves that GeoData had access to the Bytes Files. GeoData counters that it received the compact disc copies from one of its customers who had received them from COMPS, Inc. apparently sometime after December of 2000, which is when COMPS, Inc. purchased its Bytes of the Big Apple license for the City's five boroughs. (*See* Def.'s 56.1 ¶ 30.) The City, in turn, calls attention to Vinsky's testimony that Delta Soft performed its work for GeoData in 2000 and 2001, which time frame permits for the possibility that GeoData used

COMPS, Inc.'s copy of the Bytes Files in creating GeoData's maps. (*See* Vinsky Test. 53:7-24.[13])

GeoData has raised an issue of fact concerning whether it had access to the City's Bytes Files. Accordingly, the court turns now to the issue of whether there is "substantial similarity" between the parties' maps, which, if demonstrated, may overcome the City's need to show access. *See Repp*, 132 F.3d at 889.

### b.    Substantial Similarity

To determine whether two works are substantially similar, "a court must ask whether an average lay observer would . . . recognize the alleged copy as having been appropriated from the copyrighted work." *Streetwise Maps, Inc.*, 159 F.3d at 747 (citation and internal quotation marks omitted). However, in a situation involving clear evidence of wholesale copying, the "total concept and overall feel" test is inapplicable. *See Lynx Ventures, LLC v. Miller*, No. 02-7282, 2002 WL 31007386, at *2 (2d Cir. 2002). "The court. . . must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking." *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134-35 (2d Cir. 2003).

The City argues that GeoData engaged in wholesale copying of the copyrightable elements of its Bytes Files and then made superficial changes to the overall product. The City highlights alleged "striking similarities" between the two products that purportedly prove wholesale copying: (1) identical coordinates comprising the shapes in both maps, (2) identical features and lot numbers

---

[13]Vinsky's testimony is attached as Exhibit A to Singleton's Reply Declaration dated October 31, 2005.

in the two maps that are not in the publicly available DOF maps, such as the Park Avenue and Pelham Parkway malls, to which the DCP assigned fake lot numbers, (3) identical identification numbers on the condominiums, and (4) the representation of New York City in both maps at an identical point in time despite the fact that the City issued its second copyrighted version of the Bytes files in 1998, while GeoData issued its map in 2002. (*See* Pl.'s 56.1 ¶ 29; Miller Decl. Ex. D at 2.)

GeoData contends that it did not copy the Bytes Files but that, rather, it engaged DeltaSoft to independently create its tax map. GeoData emphasizes the differences between the two maps, arguing that the total look and feel of their map belies the City's claim of substantial similarity. The similarity between the two maps, GeoData suggests, is because DeltaSoft used publicly available sources, including raster versions of the DOF maps, to create its version of the map.

The court finds that the undisputed facts clearly reflect "substantial similarity" between the the Bytes Files and GeoData's map and, further, that the similarity is so striking that the City need not demonstrate GeoData's access to the Bytes Files to prove copying. In creating its copyrighted version of the map, DCP programmers manually selected coordinates on a plane, connected by line segments, in order to create the shapes comprising its map. As explained above, the selection of each coordinate involved an individual decision made by the programmer in order to approximate the shapes he or she was attempting to create. Thus, the chances of an automatic program selecting the exact same coordinates as a human programmer in creating a similar map, even if both maps were based on the same raster images, are highly unlikely, a conclusion with which GeoData's own proffered expert, Dr. Polina Golland, concurs. (*See* Miller Decl. ¶ 31; Golland Reply Test.[14] 78:12-80:14.) In the instant case, most of the coordinates, or control points, used in GeoData's map to

---

[14]This deposition is attached as Exhibit A to Singleton's Reply Declaration.

represent the tax lot lines, including curved lines, were completely identical to the points used in the Bytes Files. (Pl.'s 56.1 ¶ 27; Def.'s 56.1 ¶ 27; *see also* Miller Decl. Ex. D at 14-30 (comparing shapes from the two maps, which reflect the identical control points).) Although GeoData claims that many of the control points used in the Bytes Files were available in public tax block maps, no reasonable factfinder could find that a vectorization program would be able to select the exact same points as the Bytes Files from complex raster images involving curved lines, even if GeoData performed corrections to the map after-the-fact. Furthermore, GeoData's explanation does not account for the identical control points for images that were not reflected in the publicly available raster images, for which GeoData offers no rationale. (*See* Def.'s 56.1 ¶¶ 27-28.)

GeoData insists that it independently created its vectorized maps of New York City, providing testimony to this end from Vinsky, Komarov, and Golland. However, Vinsky cannot offer testimony concerning how DeltaSoft created the map because he does not have personal knowledge about this alleged fact. *See* FED. R. CIV. P. 56(e) ("Supporting . . . affidavits shall be made on personal knowledge."). To the extent that Vinsky's information is based on what DeltaSoft employees may have informed him, such information is inadmissible as hearsay under FED. R. EVID. 802. *See Patterson v. City of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (stating that "an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial"). Golland provides her opinion that DeltaSoft's map could have been created independently; however, her report and opinion focus on the differences between the two maps rather than on the identical control points, which this court views as critical to the analysis. (*See* Golland Decl. Ex. 2 at 6-10.) She offers no plausible explanation for the identical control points, except to reiterate that raster versions of the DOF maps were publicly available. (*See* Golland

Decl. Ex. 3 at 1-2.)

Komarov, who, as a former manager of DeltaSoft, has personal knowledge concerning DeltaSoft's alleged involvement, states in his one-and-a-half page declaration that DeltaSoft "used various software, including R2V and others, to vectorize the maps" and that the company staffed about twelve programmers and engineers on the project. (Komarov Decl. ¶¶ 4-5.) Furthermore, he affirms that DeltaSoft had Internet access to a raster version of the City's maps, provided by GeoData, as well as other publicly available tax block maps and raster versions of tax lot maps, but did not have access to or rely on the Bytes Files. (Komarov Decl. ¶¶ 4, 7.)

Komarov's declaration, if even admissible,[15] does absolutely nothing to enlighten the court on the issue of copying. The declaration is vaguely worded; for example, Komarov states that he had access to various publicly available tax maps, but he never states what sources DeltaSoft actually used. In addition, apart from naming one software program allegedly used, R2V, Komarov provides no inkling of the process by which DeltaSoft created GeoData's map.[16] The crucial failing in Komarov's declaration is that it does not address how DeltaSoft–either with or without the R2V program–managed to achieve the implausible result of selecting control points identical to those in the Bytes Files. Komarov's declaration, phrased in conclusory terms, raises more questions than it answers, and simply fails to create any issue of fact concerning whether DeltaSoft copied the Bytes files.

---

[15]*See, supra*, n. 9.

[16]The only information the court was able to cull from GeoData's papers about the R2V software program was from a small section of Golland's report, which was not referenced in GeoData's memoranda or 56.1 Statement, explaining that R2V automatically converts raster images into vector representations. (Golland Decl. Ex. 2 at 4, Oct. 10, 2005.)

GeoData attempts to obscure the problem of the identical control points by highlighting numerous differences between the maps, such as the omission of certain features in its map that exist in the Bytes Files, the absence of various tax lots in its map that appear in the City's map, errors in the contents of GeoData's map, the slight misalignment of some shapes, formatting and organizational differences, and others. GeoData relies on *Streetwise* in arguing that the total look and feel of the two maps differ, counseling against a finding of substantial similarity. *See Streetwise Maps, Inc.*, 159 F.3d at 748. However, the court finds that the existence of identical control points in both maps leads to the ineluctable conclusion of wholesale copying. Accordingly, the "total concept and feel" test does not apply. *See Lynx Ventures, LLC*, 2002 WL 31007386, at *2 ("We have never applied the total concept and feel test to instances where the alleged infringement involves the verbatim and wholesale copying of original text.") In the words of Judge Learned Hand, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936).

Thus, the court finds that GeoData's map is "substantially similar" to the Bytes Files, a result with which no reasonable juror could differ, given the uncontested fact of the innumerable identical control points between the two maps. Moreover, GeoData's map is so strikingly similar to the Bytes Files that the court further determines that the City need not show access by GeoData to the Bytes Files in order to demonstrate actual copying. *See Repp*, 132 F.3d at 889. Consequently, there is no genuine issue for trial. The court thus grants the City's request for partial summary judgment, holding that GeoData infringed on the City's copyright.

## III.    Defendant's Motion to Dismiss

GeoData requests that this court dismiss the City's claim for statutory damages and attorneys'

fees pursuant to 17 U.S.C. § 412 of the United States Copyright Law (the "Copyright Act"). GeoData's motion to dismiss is denied.

The Copyright Act permits the holder of a valid copyright to claim, at his or her election, either actual damages and profits or statutory damages from the infringing party. 17 U.S.C. § 504. In addition, the copyright holder may be able to recover costs, including reasonable attorneys' fees. 17 U.S.C. § 505. However, under 17 U.S.C. § 412, "no award of statutory damages or of attorney's fees. . . shall be made for. . . (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."

GeoData points out, first, that its alleged infringement occurred starting August of 2001, well before the October 4, 2002 effective date of the City's copyright in the 1998 version of the Bytes Files. (Def.'s 56.1 for MTD ¶¶ 8, 4.) Second, GeoData highlights that the City did not register this copyright within three months after the first date of publication. (*See* Def.'s 56.1 for MTD ¶¶ 4-5.) Accordingly, GeoData argues, this court should dismiss the City's claim for statutory damages and attorneys' fees pursuant to 17 U.S.C. § 412. The City, on the other hand, argues that the 1998 version of the Bytes Files is derivative of the original Bytes Files, which was copyrighted in 1995, and that, by copying the derivative work, GeoData infringed upon its earlier copyright in the work. (Pl.'s Opposition Mem. to MTD 3.)

The court agrees with the City. The 1998 version of the Bytes Files is a "derivative work" of the original copyrighted Bytes Files. *See* 17 U.S.C. § 101. The copyright status of a derivative work "does not affect. . . any copyright protection in the preexisting material." *Id.* § 103(b). Along the same vein, the Second Circuit has long held that limited copyright protection is available to an

uncopyrighted derivative work to the extent that it is derived from a work that is validly copyrighted.

*G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469, 472 (2d Cir. 1951); *see also Grove Press, Inc. v. Greenleaf Publ'g. Co.*, 247 F. Supp. 518, 527 (E.D.N.Y. 1965) ("Unauthorized copying may be effected either directly or indirectly; thus copying from a copy is no less an infringement than copying from the original copyrighted work."). Protection from copying is afforded to just those portions of the uncopyrighted work that are derived from the underlying work. *G. Ricordi & Co.*, 189 F.2d at 472.

Therefore, because the Bytes Files are protected under the 1995 copyright, section 412 does not bar an award of statutory damages and attorneys' fees. To the extent that GeoData's map includes portions of the 1998 version of the Bytes Files that were not derived from the original version, this is an issue more appropriately considered when assessing damages. Accordingly, GeoData's partial motion to dismiss is denied.

## IV.    Conclusion

For the reasons set forth above, the court holds that GeoData infringed on the City's copyright and, thus, grants the City's motion for partial summary judgment. Furthermore, the court denies GeoData's motion to dismiss the City's request for statutory damages and attorneys' fees.

SO ORDERED.

DATED:      Brooklyn, New York
            September 28, 2007

```
_____/s/_____
```
            DORA L. IRIZARRY
            United States District Judge

21